# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 25, 2001

## STATE OF TENNESSEE v. DWAYNE SIMMONS

### Direct Appeal from the Circuit Court for Maury County
### No. 11070     Robert L. Jones, Judge

---

### No. M2000-01199-CCA-R3-CD - Filed May 11, 2001

---

The defendant, indicted for the false reporting of a bomb threat at an elementary school, was convicted of the offense of harassment, and fined $1000. No motion for a new trial was filed. In a *pro se* appeal to this court, the defendant raises essentially four issues: (1) whether he was denied effective assistance of counsel; (2) whether he was denied the right to testify at trial; (3) whether the State withheld exculpatory evidence; and (4) whether the evidence was sufficient to support his conviction of harassment. After a careful review of the record and applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Dwayne Simmons, Columbia, Tennessee, Pro Se (on appeal) and Dana C. McLendon, III, Franklin, Tennessee (at trial) for the appellant, Dwayne Simmons.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; T. Michael Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Dwayne Simmons, who was forty years old at the time of trial, was convicted in the Maury County Circuit Court of one count of harassment, a Class A misdemeanor, for threatening to plant a bomb at a Maury County elementary school. In his *pro se* appeal to this court, he appears to raise essentially the following four issues:

> I.     Whether he was denied effective assistance of counsel by trial counsel's failure to present any evidence at trial;

II.      Whether he was denied the right to testify in his own behalf;

III.      Whether the State withheld exculpatory evidence; and

IV.      Whether the evidence was sufficient to support his conviction.

Based upon a thorough review of the record and of applicable law, we affirm the judgment of the trial court.

## FACTS

On May 21, 1999, the Maury County Grand Jury returned an indictment against the defendant, charging him with the false reporting of a bomb threat at Riverside Elementary School in Columbia, in violation of Tennessee Code Annotated Section 39-16-502(a)(2).[1] Trial was held on March 16, 2000, before a jury in the Circuit Court of Maury County. At trial and at the sentencing hearing which followed on April 24, 2000, the defendant was represented by retained counsel.

The State's first witness was Kellie Shrake, a dispatcher for the Columbia Police Department. Shrake testified that on the morning of March 12, 1999, she received a phone call from a man who identified himself as the defendant. On the tape of the call, which was played before the jury, the defendant can be heard asking to speak to Sergeant Ehret of the Columbia Police Department. Shrake asks what the call is in reference to, and the defendant tells her that Ehret at some time in the past talked him out of bombing the Maury Regional Hospital, that he now plans to do something even more stupid, and that he wants to talk to Ehret before he acts.

Shrake acknowledged on cross-examination that the defendant called the seven-digit phone number of the Columbia Police Department rather than 911, provided his full name and phone number, referred to Sergeant Ehret as a friend, and was polite throughout the call. She admitted that he had said that he intended to wait twenty-four hours before taking action, and that he had not mentioned specifically what it was that he planned to do.

Sergeant Thomas Ehret testified that he had known the defendant, whom he described as a "friendly," "intelligent person," for ten or eleven years. They had met at a local mall, where Sergeant Ehret had worked during his off-duty hours as a security guard, and the defendant had played arcade games. During the course of their conversations, the defendant revealed that he, like Ehret, was an Army veteran. The defendant told him that he had been a combat engineer in the military, and that

---

[1] Although the indictment alleged that the defendant had violated § 39-16-502(a)(2), it then set out the elements of § 39-16-502(a)(3). Since trial proceeded with the apparent understanding of the parties and the trial court that the defendant had been charged with violating the latter section, this error is harmless. See State v. Bowers, 673 S.W.2d 887, 888 (Tenn. Crim. App. 1984) (concluding that "erroneous recitation of a statute is mere surplusage and not fatal to the charging instrument" and failure to timely object to such a defect results in waiver).

he had been selected from the ranks of enlisted men to attend the United States Military Academy at West Point. He had later gotten in some kind of trouble and left the Army. Ehret knew the defendant's claims to be true, the defendant once having shown him his "DD 214," or official military record. As an Army enlisted man, Ehret said, the defendant would have undergone basic training in the use of various firearms and explosive devices.

After receiving a page and phone call from Shrake at approximately 10:20 a.m. on March 12, 1999, informing him of the defendant's phone call to the 911 center, Ehret called the defendant at home. "Talking rapidly" and "somewhat erratic[ally]," the angry defendant told him that a teacher at Riverside Elementary School had refused to allow his son to go to the bathroom, causing the child to soil himself. According to the defendant, it had happened once before. The defendant mentioned having talked to the principal, referring to him as "a neolithic racist," said that he was "sick and tired of it," and was going to take matters into his own hands. Asked what he meant, the defendant said that he would make a bomb and blow up the school, and that he did not "give a f--k" who he hurt. The defendant told Ehret that he was going to go "get some stuff." When Ehret asked, "To make a device?" referring to a bomb, the defendant answered, "Yes." The defendant hung up as Ehret was attempting to reason with him, urging him to stop and consider the consequences.

Based on his knowledge of the defendant's personality and military background, Ehret believed that the defendant was capable of carrying out his threat. Ehret took immediate action, contacting his superior to ask that the school be alerted to the threat, and calling the district attorney general's office for assistance in drawing up a warrant for the defendant's arrest. He then drove to the school, where he met with the principal. When he arrived at the school, he found that the principal was aware that some sort of threat had been made against the school, but unaware that it had been a bomb threat. Ehret testified that after the principal's consultation with a school board member, the decision was made to evacuate the school, and school resource officers and other law enforcement personnel were brought in to search for a bomb. No bomb devices were found.

Ehret admitted on cross-examination that he had helped the defendant in the past, and that the defendant probably considered him as someone in whom he could confide his problems. He also admitted that he may have been mistaken in reporting that Shrake had told him, when informing him of the defendant's phone call to the 911 center, that the defendant had threatened to bomb Riverside Elementary School. His best recollection, however, was that Shrake had told him that the defendant had threatened the school.

Ehret testified that the defendant had not been seen that day at the school, and had offered no resistance when they arrested him at his home later that evening. He had never known the defendant to commit a violent act. However, he had known of his threatening violence in the past, when he threatened to blow up the Maury Regional Hospital. A number of law enforcement officials had responded to that incident, and he had become involved because of his personal knowledge of the defendant.

Charles Kenneth Wiles, principal of the Riverside Elementary School, testified that the bomb threat, which made him apprehensive for the safety of students and staff, disrupted the school's normal routine. The school was first placed in "lockdown mode," in which the children were confined to their classrooms, while officers searched the building and grounds for a bomb. The children were eventually dismissed slightly early, under closer than normal supervision and control. On cross-examination, Wiles admitted that he learned of the bomb threat through Sergeant Ehret, and that the defendant had never threatened him or the school in any conversations that Wiles had had with him.

Following the trial court's denial of his motion for judgment of acquittal, the defendant rested his case without presenting any proof. After deliberations, the jury found him guilty of harassment, and fined him $1000. On April 24, 2000, the trial court sentenced the defendant to eleven months and twenty-nine days in the county jail at 75%. On May 3, 2000, the court amended the judgment, ordering that the defendant serve thirty continuous days in jail, and be placed on supervised probation for the remainder of the sentence. On May 17, 2000, the defendant filed a *pro se* notice of appeal to this court. No motion for a new trial was filed. By order dated July 26, 2000, defense counsel's June 30, 2000, motion to withdraw his representation, due to the defendant's failure to pay for his services, was granted.

## ANALYSIS

### I.  Ineffective Representation of Counsel

The defendant contends that his trial counsel provided ineffective representation by failing to offer any proof in his behalf at trial. Specifically, he asserts that trial counsel was deficient for failing to offer evidence that would have resulted in his acquittal. The State argues that the defendant waived this issue by his failure to raise it in a timely motion for a new trial.

No motion for a new trial was filed in this case. The failure to file a motion for a new trial within thirty days from the date that the order of sentence is entered results in the waiver of any issues that should have been presented in the motion for a new trial. See Tenn. R. App. P. 3(e); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). Tennessee Rule of Appellate Procedure 3(e) states, in pertinent part:

> Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Thus, the defendant waived this issue on appeal by his failure to raise it in a timely motion for a new trial.

Regardless of the waiver, the record does not support the defendant's claim of ineffective assistance of counsel based on trial counsel's failure to present evidence at trial. To make out a successful ineffective assistance of counsel claim, the defendant bears the burden of proving both that his counsel was deficient in his representation, and that the deficiency prejudiced the outcome of his case. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). A showing of deficient performance requires proof that "the advice given or the service rendered was not within the range of competence demanded of attorneys in criminal cases[.]" Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). We indulge in a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test requires proof that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The defendant's insufficient showing on either prong of the test results in the failure of his ineffective assistance claim. Id. at 697, 104 S. Ct. at 2069; see also Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Here, the defendant bases his ineffective assistance of counsel claim on trial counsel's failure to present any proof at trial. As "proof" of the deficiency of counsel's performance, the defendant refers this court to trial counsel's discovery request to the State, seeking any "recorded testimony of the defendant before a grand jury,"[2] and any "books, papers, documents, photographs, . . . which are within the possession, custody or control of the State, and which are material to the preparation of the defendant's defense[.]" From this discovery request, the defendant apparently leaps to the conclusion that trial counsel received evidence from the State that was material to his defense, and yet failed to present it at trial. Nothing in the record supports this conclusion. The defendant offers no other proof in support of his claim, other than the fact that he was convicted after trial counsel had rested his case without presenting any evidence in his behalf. The fact that a strategy or tactic failed or hurt the defense, however, does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1997). Since the defendant has failed to show that counsel's performance was deficient, his claim of ineffective assistance must fail. This issue, therefore, is without merit.

---

[2]There is no evidence that the defendant ever appeared before the grand jury.

## II. Denial of Right to Testify

The defendant contends that he was denied his right to testify in his own behalf. Without specifically addressing this issue,[3] the State argues that the defendant has waived all issues other than the sufficiency of the evidence by his failure to raise them in a timely motion for a new trial.

Even though the defendant failed to raise this issue in a motion for a new trial, this court may, within its discretion, take notice at any time of an error which affects a substantial right of the accused where it may be necessary to do substantial justice. Tenn. R. Crim. P. 52(b). In Momon v. State, 18 S.W.3d 152 (Tenn. 1999), our supreme court held that the right of a defendant to testify in his own behalf is a fundamental constitutional right, which may only be personally waived by the defendant. Id. at 161. To ensure that the right to testify has been personally waived by the defendant, the Momon court directed trial courts in all future cases to follow procedural guidelines which call for defense counsel to request a jury-out hearing in the presence of the trial court to demonstrate that the defendant's waiver of the right to testify has been knowingly, intelligently, and voluntarily made. Id. at 163. At this hearing, which "shall be placed on the record," defense counsel must at a minimum show "that the defendant knows and understands":

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
>
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

Id. at 162. The mere failure of a trial court to follow these guidelines, however, is not enough to support the defendant's claim that he was deprived of his constitutional right to testify "if there is evidence in the record to establish that the right was otherwise personally waived by the defendant." Id. at 163.

Although the trial in this case took place approximately four months after the release of the Momon opinion, there is no evidence that the procedural guidelines established by the Momon court were followed. Nor is there any other evidence included in the record to show that the defendant personally waived his right to testify. The record reflects only two instances in which mention was

---

[3]The defendant's brief is somewhat confusing, making it difficult to discern exactly what issues he is attempting to raise.

made of the defendant's testifying, neither of which shows that the defendant personally waived his right to testify.

The first instance occurred prior to trial. As trial counsel was arguing motions in limine, he asked that the judge assume, for the purposes of the motions, that the defendant would not be testifying. The defendant raised his hand, saying "Please, Your Honor. I have no problem in testifying." Trial counsel merely said, "We'll get to that," and continued his arguments. The second instance occurred after the trial court's denial of the defendant's motion for judgment of acquittal, when the following exchange between the trial court and trial counsel took place:

THE COURT: Now, what evidence do you anticipate?

[TRIAL COUNSEL]: None, Your Honor.

THE COURT: You are not going to put the defendant on?

[TRIAL COUNSEL]: No, Your Honor.

THE COURT: Okay. So you'll need an instruction on that.

The record is silent regarding any private conversations trial counsel may have had with the defendant. In the absence of evidence to show that the defendant personally waived his right to testify, we must presume that he did not. See id. at 162 ("The waiver of a fundamental right will not be presumed from a silent record, and the courts should indulge every reasonable presumption against the waiver of a fundamental right.") ( citations omitted).

The denial of the right to testify, however, is subject to the harmless error doctrine. Id. at 166. As the Momon court stated:

[C]ourts should consider the following factors when determining whether the denial of the right to testify is harmless beyond a reasonable doubt: (1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; (4) the overall strength of the prosecution's case. As previously stated, the goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict. Accordingly, the factors identified herein are merely instructive and not exclusive considerations.

Id. at 168 (citation and footnote omitted).

After a thorough review of the record, we conclude that the denial of the defendant's right to testify in this case constituted harmless error. Some indication of what the defendant's testimony at trial would have been may be gleaned from his testimony at the sentencing hearing, where he complained that he had not been allowed to tell his "side of the story." According to the defendant, he had told Sergeant Ehret that he was "going to get some stuff," but had not said that it was for a bomb. The defendant's testimony, thus, would have contradicted Sergeant Ehret's account of the conversation.

The defendant further testified at sentencing that he suffered from bipolar disorder, and was currently unemployed and receiving disability. Claiming an I.Q. of 195, he said that he had been one of the first African-Americans appointed to West Point. He had been forced to leave just short of graduation because of his failure to maintain a 2.0 grade point average, which he blamed on the stress of being one of the first African-Americans at the school, his alcoholism, and his bipolar disorder. He had ceased taking the medication prescribed for his mental disorder some time prior to the instant offense, opting instead to "self-medicate" with cocaine and marijuana. He had last seen a psychiatrist in 1998, and a psychologist in January of 1999, but was not currently taking any prescription medication. When asked if he felt remorse for the situation that occurred at the school on March 12, 1999, the defendant answered that he did, in that the teachers and administration had not properly handled his complaints about the treatment of his children, and it hurt him as a parent "that [he] would have to go through all this to get this problem resolved."

In light of the defendant's obvious mental problems, it is unlikely that his testifying would have helped his case. Sergeant Ehret's testimony that the defendant told him that he was going to get "stuff" to make a bomb directly contradicts the defendant's version of their conversation, that while he had told Sergeant Ehret that he was going to "get some stuff," he had answered "No," rather than "Yes," when Sergeant Ehret asked if he meant "stuff" to make a device. Sergeant Ehret's account, moreover, was corroborated by the tape of the defendant's conversation with Kellie Shrake, in which he clearly mentions having planned to do something stupid in the past when he threatened to bomb the hospital, and that he now intends to do something more drastic. Overall, the State's case against the defendant was very strong. In sum, we conclude that the denial of the defendant's right to testify was harmless beyond a reasonable doubt.

### III. Alleged Brady Violation

The defendant contends that the State deprived him of due process of law by its failure to provide him with exculpatory evidence, without mentioning what exculpatory evidence he was denied. Under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the State had a duty to furnish the defendant with any exculpatory evidence in its possession. Our review of the record reveals no evidence that the State failed to furnish exculpatory evidence to the defendant or his counsel. The defendant's bare allegation that he was denied exculpatory material, unsupported by any facts, is insufficient to show a Brady violation. This issue, therefore, is without merit.

# IV. Sufficiency of the Evidence

Finally, the defendant contends that the evidence was insufficient to support his conviction of harassment. He argues that the State failed to prove intent, a necessary element to harassment, and failed to offer any corroborating evidence in support of Sergeant Ehret's testimony that the defendant threatened to bomb the school. The defendant contends that the testimony of Sergeant Ehret, the only State witness able to testify that the defendant actually made a threat to bomb the school, was not credible. As support, he points out that the tape-recording of his phone call to the Columbia Police Department shows that he never mentioned bombing Riverside Elementary School, but that Sergeant Ehret reported having first learned of the defendant's threat against the school from Kellie Shrake.

Our standard of review when the sufficiency of the evidence is challenged on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant's conviction stemmed from his violation of the following statute:

> (a) A person commits an offense who intentionally:
>
> (1) Threatens, by telephone or in writing, to take action known to be unlawful against any person, and by this action knowingly annoys or alarms the recipient[.]

Tenn. Code Ann. § 39-17-308(a)(1) (1997). A person acts intentionally when it is his or her "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997). A person acts "knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann.§ 39-11-302(b) (1997).

Viewed in the light most favorable to the State, the evidence established that the defendant was guilty of harassment beyond a reasonable doubt. The defendant telephoned the Columbia Police

Department on the morning of March 12, 1999, asking to speak to Sergeant Ehret. The tape of his phone call reveals that, while not directly threatening Riverside Elementary School, he told dispatcher Kellie Shrake that Ehret had earlier talked him out of bombing the Maury Regional Hospital, that he now plans something more drastic, that he wants to speak to Ehret before he acts, and that if he does not hear from him within twenty-four hours he intends to implement his plans. Sergeant Ehret testified that when he called, the "agitated" defendant told him that he was going to blow up Riverside Elementary School, that he was going to "get some stuff," indicating that it was "stuff" to make a bomb, and hung up the phone. From Sergeant Ehret's testimony, it was clear that the defendant knew that Sergeant Ehret, a police officer who was familiar with the defendant's military background and mental condition, and who had been involved in the police response to the defendant's previous bomb threat, would take seriously the defendant's threat against the elementary school. Thus, based on the evidence, the defendant's conviction for harassment was proper.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-10-